IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| HASSAN RAASHANN SHABAZZ, | ) | |
| Plaintiff, | ) | Civil Action No. 7:14-cv-00457 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| B.J. LOKEY, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Hassan Raashann Shabazz (Shabazz), who initially represented himself but was represented by counsel at trial, is an inmate at the Augusta Correctional Center (ACC), a Virginia Department of Corrections (VDOC) facility. His complaint, filed pursuant to 42 U.S.C. § 1983, alleged violations of his First and Fourteenth Amendment rights, violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), a state claim for detinue, and a state claim under the Virginia Tort Claims Act, following the confiscation of documents from his cell.

Shabazz alleges that he is a member of the Nation of Islam (NOI) and that he possessed religious NOI documents because he is required to study them. The documents were confiscated from him on May 1, 2013, after VDOC staff determined that the documents were gang-related because they are affiliated with a group called the Nations of Gods and Earth (NGE), also known as the Five Percenters. VDOC has a zero-tolerance policy regarding gang-related materials. As made clear at trial, Shabazz is not challenging the zero-tolerance policy on its face or as applied to NGE Members/Five Percenters, but contends that he is not a NGE member and the confiscation violated his rights as an NOI follower.

All but two defendants were dismissed at the summary judgment stage, and the only claims that remained to be tried were plaintiff's First Amendment (free exercise clause), RLUIPA, and detinue claims against defendants B. J. Lokey (Lokey) and L. H. Leatherwood (Leatherwood). (Mem. Op. & Order, Dkt. Nos. 28, 29.) The court also determined on summary judgment that Shabazz "cannot recover damages against Defendants under RLUIPA or in their official capacities under 42 U.S.C. § 1983." (Mem. Op. 9 n.9.)

During the bench trial, all parties presented evidence and argument, and the court took under advisement defendants' oral motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c). Based on all the evidence presented during trial, the court issues this memorandum opinion and order, which constitutes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT

1. Shabazz is an inmate in the custody of VDOC. He has been in custody for approximately 17 years and is currently housed at ACC, where he was housed on May 1, 2013.

2. As of May 1, 2013, Lokey was employed by VDOC as an Intelligence Officer at ACC.

3. As of May 1, 2013, Leatherwood was employed by VDOC as a Gang Specialist within VDOC's Gang Management Unit.

4. Shabazz is and has been a member of NOI since 1996. He was not in VDOC custody when he joined. In order to join NOI, he went through a process of purification, which included fasting, and had to memorize answers to questions in the Student Enrollment. A letter of sincerity to Master Fard Muhammad, NOI's founder, was also required, professing sincerity to "The Supreme Wisdom." "The Supreme Wisdom Lessons" are gradually provided during NOI orientation under the tutelage of a person that has been rigorously trained. "The

Supreme Wisdom Lessons" are not distributed to others because those who have not been trained may misconstrue them.

5. Shabazz has a sincerely-held religious need to adhere to his personal faith of NOI. His sincerely-held religious practices include, *inter alia*, reading lessons daily from "The Supreme Wisdom Lessons," which is a central canonical source for his faith. The "Instructions Given to the Laborers," part of "The Supreme Wisdom Lessons," instructs that the student is to study and "memorize by heart all answers of said lesson number 1." Shabazz believes that he must study "The Supreme Wisdom Lessons" to memorize all answers to the lessons as he was instructed to do, in part by the "Instructions Given to the Laborers." Also, Shabazz uses other texts commonly known to the NOI community to help him understand "The Supreme Wisdom Lessons" and his personal faith. Shabazz's copy of "The Supreme Wisdom Lessons" and other religious documents consisted of unbound papers that were photocopied, transcribed, typed, or handwritten. He constantly revisits the lessons, as he must. This is a core requirement of NOI so that NOI members can go through the same experience Elijah Muhammad (the messenger of Allah) did when he was under the tutelage of Master Fard Muhammad (the founder and head of NOI). Upon cross-examination, Shabazz demonstrated his thorough knowledge of the lessons.

6. Wali Hafil El-Shabazz, an inmate at ACC from 1994 through 1998 and again from 2014 through at least the trial date, who serves as the resident student secretary of NOI at ACC, confirmed Shabazz's understanding of the requirements of NOI and the importance of the texts. He has always had a copy of "The Supreme Wisdom Lessons" while at ACC and confirmed that Shabazz regularly attended NOI services at ACC. Shabazz's regular attendance at NOI services was also confirmed by Paul Ritter, ACC's Chaplain.

7. Michael Muhammad Knight, Professor of Religious Studies at Kenyon College, specializes and is an expert in Islamic studies. These studies include NOI. NOI history began in 1930 when it was founded by Master Fard Muhammad. Elijah Muhammad was a student of Master Fard Muhammad and was the NOI leader for about 40 years. He wrote extensively. Following his passing, Louis Farrakhan became NOI's leader. NOI's central, foundational text is "The Supreme Wisdom Lessons" and access to it is required. Followers also refer to the Bible and the Quran. NOI followers believe that God is a man with a body and not a "mystery God" or transcendent invisible spirit.

8. Professor Knight also testified to the founding of NGE, also known as the Five Percenters. NGE was formed in the mid-1960s in Harlem by Clarence 13X, also known as Allah. Similar to the protestant reformation when Martin Luther looked at the book of Romans and other books in the Bible and broke away from the Catholic Church, Clarence 13X reinterpreted "The Supreme Wisdom Lessons" and espoused the belief that the black man is God and that all black men are gods equally without a privileged supreme knower above them. This contrasts with NOI members who believe that black people are divine, but that there is one supreme knower, Allah, and he is Master Fard Muhammad, who had a privileged messenger who was Elijah Muhammad and is now Louis Farrakhan.

9. VDOC recognizes NOI as a permitted religious sect within its prisons. VDOC is a department of the Commonwealth of Virginia and receives federal funding.

10. The VDOC has recognized NGE, or Five Percenters, as a gang and security threat group for the past twenty-plus years. The VDOC recognizes NGE as a violent gang and separatist hate group in part because NGE members believe in their racial superiority and have been

involved in stabbings and drug distribution within VDOC facilities. NGE is one of the top three or four gangs in VDOC with approximately 1,500 members.

11. NGE members are not allowed to congregate for purposes of NGE. However, an NGE member is not prohibited from being on a prison's master pass list to attend religious services. For example, NGE members are known to attend the religious services of Sunni Muslims, Buddhists, Rastafarians, and NOI Muslims. NGE members are known to take over other inmates' group meetings in order to congregate to evade the VDOC's ban on NGE gatherings. NGE inmates had overtaken NOI services at ACC as recently as 2012.

12. The VDOC has a zero-tolerance policy toward prison gangs. While there was testimony that the zero-tolerance policy applies to everyone regardless of whether or not an inmate associates with, or is suspected to associate with, a gang, it is also the case that investigators must look to the entire collection of documents possessed by an inmate and look to the intent of the documents. If an NOI member possesses suspected gang materials, he may be interviewed. Indeed, this happened to Shabazz in 2009 when he was housed in VDOC's Haynesville Correctional Center (HCC). The institutional investigator at HCC seized Shabazz's religious documents, believing them to be NGE documents. After the investigator questioned Shabazz about the documents and Shabazz's faith, however, he returned the religious documents to Shabazz.

13. VDOC staff believes Five Percenters use secret codes to communicate, recruit, and organize within prisons. Also, VDOC staff believes that tension and conflict would increase if NGE materials were disseminated among rival groups.

14. Just like NOI adherents, NGE members rely on "The Supreme Wisdom Lessons" as a foundational text, but the two groups interpret "The Supreme Wisdom Lessons" and the

history of their organizations differently. Both NGE and NOI deem the meaning of numbers via mathematics, known as "The Supreme Mathematics," central to their respective beliefs and behaviors. In contrast, "The Solar Facts" is considered primarily an NGE text. Nonetheless, the various documents used for either NGE or NOI purposes do not always clearly reveal their purpose or affiliation with just NOI or just NGE.

15. The VDOC uses a Faith Review Committee to adjudicate inmates' requests for recognition of documents, texts, or books as authorized religious materials. If the Faith Review Committee approves an item or publication for religious purposes, an inmate is permitted to keep the item or publication for religious purposes.

16. As of May 1, 2013, Shabazz had not sought the Faith Review Committee's approval to deem his religious documents as recognized religious texts for NOI members, and no evidence was provided as to whether the Faith Review Committee had ever approved religious documents like Shabazz's for NOI members.

17. Pursuant to the zero-tolerance policy, VDOC staff search the cells of suspected or known NGE gang members to look for, *inter alia*, NGE affiliated identifiers like numerology, "The Supreme Mathematics," "The Supreme Alphabets," "The Book of Life," "The Lost and Found Lessons 1 and 2," "Student Enrollment," "120 Degrees," "A.L.L.A.H.," "Arm Leg Leg Arm Head," "Roaming the Earth," "The Solar Facts," "The Great Understanding," "The Actual Facts," "English Lesson C," "cipher," and "Born Day." Investigators then review the materials to determine whether the collection of materials shows an intent regarding gang activity.

18. If VDOC determines that the materials are gang-related, the items are seized as contraband, and staff would assign one or more points to an inmate's file to document a possible

affiliation with a gang. The VDOC uses a ten-point system to categorize possible gang affiliation: validated at ten points or more, suspected at between one and nine points, and unaffiliated at zero points.

19. At various times since 2000 and prior to May 1, 2013, Shabazz was allowed to possess his religious materials.

20. At some time prior to his incarceration at ACC, Shabazz was housed at James River Correctional Center (JRCC), another VDOC facility. Staff at JRCC confiscated Shabazz's "Star and Crescent" necklace, which depicted the NOI's emblem, as NGE paraphernalia. After Shabazz filed an administrative grievance, the NOI necklace was returned to him. However, an alert remained in Shabazz's inmate file flagging him as a suspected NGE member.

21. As of May 1, 2013, Shabazz's inmate record had at least one alert indicating he was a suspected NGE member/Five Percenter.

22. Per Lokey's and Leatherwood's instructions on May 1, 2013, ACC staff searched the cells of suspected or verified Five Percenters. Shabazz's cell was one of the searched cells. Staff confiscated all of the documents in Shabazz's cell and brought them to a room for Lokey and Leatherwood to review for any prohibited gang material.

23. Lokey and Leatherwood reviewed and investigated numerous documents and items retrieved from Shabazz's cell. The documents at issue are titled "Actual Facts," "Student Enrollment," "Lost Found Muslim Lesson No. 1," "Lost Found Muslim Lesson No. 2," "First Term Examination Assignment of Mr. Elijah Muhammad," "The Problem Book," "The Supreme Mathematics," "The Supreme Alphabet," and "The Completion of the Nine 33 Cycles" (hereinafter, the Documents). Many of the Documents are sections from "The Supreme

Wisdom Lessons." The parties agree that the Documents are the only documents at issue in this case. While other documents were seized, the parties have reached an agreement with regard to these other documents.

24. Lokey and Leatherwood believed the Documents constituted prohibited NGE material in violation of VDOC's zero-tolerance gang policy. Some aspects of the Documents implicated NGE in some way by referencing NGE identifiers like "The Solar Facts," "The Supreme Alphabets," "The Completion of the Nine 33 Cycles," "The Great Understanding," numerology, "Mathematical Understanding of Student Enrollment (1-10)," and "Happy Born Day."

25. Neither Lokey nor Leatherwood questioned Shabazz, the institutional chaplain, or other VDOC staff about the Documents or about Shabazz's relationship with either NOI or NGE.

26. Shabazz's expert witness, Dr. Knight, concluded that NGE material and references appeared in the Documents, but based on his expertise and understanding of the nuances between the NOI and NGE, he also concluded that Shabazz was committed to NOI and was not using the Documents in furtherance of NGE. His conclusion was undisputed and is specifically adopted by the court.

27. Dr. Knight based his opinions on his extensive research of Islamic studies. He earned a Bachelor of Arts in Religious Studies from Skidmore College, a Master in Theological Studies from Harvard University, and a Ph.D. in Religious Studies from the University of North Carolina. He has written journalistic research-type projects on NGE and encyclopedia articles on NGE and African American Islam. For example, he has contributed to chapters or sections in *The Oxford Handbook on African American Islam* and *The Cambridge Companion to American Islam*. He was employed as a visiting professor at a college where

he teaches various religious courses about, *inter alia*, North American Islam. Dr. Knight does not work for or with VDOC.

28. Following the seizure of the Documents, Shabazz could not possess the Documents and his religious practice of reading and memorizing his religious texts was frustrated and substantially burdened.

29. As of May 1, 2013, Lokey was not aware of the beliefs, practices, or religious texts of NOI.

30. As of May 1, 2013, Leatherwood did not know that "The Supreme Wisdom Lessons" were created by NOI, and she had not investigated the religious beliefs of NOI or NOI's central texts.

31. Neither Lokey nor Leatherwood ever received any training about NOI or religion generally before seizing the Documents, and neither was involved with the Faith Review Committee.

32. Lokey and Leatherwood did not seize the Documents to intentionally interfere with Shabazz's religious beliefs or practices as they were not contemplating religion or NOI when looking through Shabazz's documents for NGE material.

33. On May 1, 2013, and on the date of the trial, neither Lokey nor Leatherwood had the authority to make, edit, or rescind VDOC policies.

34. Shabazz was convicted of an institutional charge of possessing gang paraphernalia and lost thirty days' commissary privileges.

35. No person employed or affiliated with VDOC who testified at the trial, including ACC Chaplain Paul Ritter and GraceInside President Reverend J. Randy Meyers, who advocates for the religious rights of inmates and provides guidance to VDOC, demonstrated anything more than a passing and vague familiarity with NOI, its core beliefs, and its core religious texts.

## II. ANALYSIS

### A. Standard of Review

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires that the court make specific findings of fact and state conclusions of law separately in any action tried without a jury. Specifically, the trial judge must appraise the testimony and demeanor of witnesses, as well as weigh the evidence and choose among conflicting inferences and conclusions those that seem most reasonable. *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889–90 (4th Cir. 1964). In this regard, the trial court has a unique opportunity to evaluate the credibility of witnesses and weigh the evidence accordingly. *See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013) (citing *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 855 (1982)).

A trial court must do more than announce statements of ultimate fact, *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but is not required "to make findings on all facts presented or to make detailed evidentiary findings. . . . The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

### B. Conclusions of Law

This court has jurisdiction over Shabazz's 42 U.S.C. § 1983 and RLUIPA claims pursuant to 28 U.S.C. § 1331, which confers jurisdiction on a court to resolve civil actions arising under federal law. Further, this court has jurisdiction over Shabazz's state law detinue claim pursuant to 28 U.S.C. § 1367, which empowers the court to exercise supplemental jurisdiction over claims that form part of the same case or controversy as those within the court's

original jurisdiction.

> **1. Shabazz's First Amendment and RLUIPA claims fail because defendants did not intentionally interfere with his religious rights.**

Shabazz alleges that his rights under the First Amendment and RLUIPA were violated. The court addresses each claim in turn.

> *a. First Amendment*

Section 1983 provides a cause of action against "[e]very person" who deprives a citizen of his or her constitutional rights under color of state law. 42 U.S.C. § 1983. To state a legally cognizable claim under § 1983, a plaintiff must allege that (1) a right secured by the Constitution or laws of the United States was violated, and (2) the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). The Free Exercise Clause of the First Amendment protects an inmate's right to the free exercise of religion. U.S. Const, amend. I; *Cruz v. Beto*, 405 U.S. 319, 322 (1977). The Fourth Circuit has explicitly held that "only intentional conduct is actionable under the Free Exercise Clause." *Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006). Thus, to state a claim that Lokey and Leatherwood violated his right to free exercise of religion, Shabazz "must assert conscious or intentional interference with his free exercise rights." *Id.* ("[N]egligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause.").

The court concludes that Shabazz's First Amendment claim fails because Lokey and Leatherwood did not seize the Documents to intentionally or consciously interfere with Shabazz's free exercise rights. In *Lovelace*, the Fourth Circuit reasoned that there was a "genuine dispute" as to whether a correctional officer acted intentionally to deprive an inmate of his free exercise rights where the officer's false report that he observed the inmate eating a "non-

11

Ramadan meal" caused the inmate's ineligibility to participate in the Ramadan program. 472 F.3d at 202. Here, in contrast, Lokey and Leatherwood were not—and could not have been—contemplating religion when they seized the Documents: Lokey was simply not aware of NOI beliefs or practices, and Leatherwood was not aware of its details or texts. At most, their seizure of the Documents constituted negligent conduct. Furthermore, Lokey and Leatherwood had no past experience—such as training or involvement with the Faith Review Committee—that would have provided such knowledge of NOI's existence. Defendants acted, not to interfere with Shabazz's religious rights, but to mitigate the perceived threat to institutional security—in accordance with VDOC policies—that was posed by NGE materials. So, even though the court determines that Lokey and Leatherwood acted intentionally in that they meant to confiscate the Documents as gang-related materials, the court concludes that Shabazz's First Amendment claim fails because Lokey's and Leatherwood's acts were not "intentional interference with [Shabazz's] free exercise rights." *See Lovelace*, 472 F.3d at 201.

    b. RLUIPA

RLUIPA prohibits government officials[1] from imposing a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). While RLUIPA "provide[s] greater protection for religious exercise than is available under the First Amendment," *Holt v. Hobbs*, 135 S. Ct. 853, 859–60 (2015), a plaintiff bears the same initial burden of proof under RLUIPA as he does under the First Amendment, *Brown v. Mathena*, No. 7:14-cv-20, 2014 WL 4656378, at *5 (W.D. Va. Sept. 16, 2014) (citing *Lovelace*, 472 F.3d at 187). Furthermore, claims under "both RLUIPA and the

---

[1] As stated above, "government" includes the defendants, who work for VDOC. 42 U.S.C. § 2000cc-5(4)(A).

First Amendment require a showing of 'conscious or intentional interference' with plaintiff's rights." *Wall v. Wade*, 741 F.3d 492, 500 n.11 (4th Cir. 2014) (quoting *Lovelace*, 472 F.3d at 201). Intentionality is required because "allowing negligence suits to proceed under RLUIPA would undermine [due] deference by exposing prison officials to an unduly high level of judicial scrutiny." *Lovelace*, 472 F.3d at 194.[2]

Because the court concludes, as explained above, that Lokey and Leatherwood's seizure of the Documents was not a conscious or intentional interference with Shabazz's religious rights, Shabazz's RLUIPA claim fails for the same reason as his First Amendment claim.[3]

### 2. Shabazz's detinue claim fails because defendants are entitled to sovereign immunity on this claim.

Next, Shabazz seeks possession of the Documents under Virginia Code § 8.01-114. Under Virginia law, an action for detinue lies when one party unlawfully withholds personal property of another. *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 620 (E.D. Va. 2005). "The object of a detinue action is to recover specific personal property and damages for its detention." *Broad St. Auto Sales, Inc. v. Baxter*, 334 S.E.2d 293, 294 (Va. 1985). In order to maintain an action in detinue, the plaintiff must show: (1) a right of property in the personal property to be recovered; (2) a right of immediate possession; (3) that the property is capable of identification and immediate possession; (4) the property has some value; and (5) that the

---

[2] Because Shabazz did not prevail on either of his claims, the injunctive relief he requests—seeking modification or rescission of VDOC's zero-tolerance policy as applied to him—is not available. Even if it were available, Lokey and Leatherwood were not, and are not, vested with authority to alter the policy. "Typically, in a claim for injunctive relief … in the context of prison litigation, th[e named] official is usually the warden of the institution where the inmate is incarcerated." *Johnson v. Lewis*, No. 3:13-cv-148, 2014 WL 7183039, at *4 (W.D.N.C. Dec. 16, 2014) (reasoning that claim for injunctive relief could go forward with respect to prison director).

[3] These defendants, and through them the VDOC, are on notice now that enforcement of the zero-tolerance policy by confiscating certain documents from sincere NOI members may substantially burden and interfere with the religious rights of NOI members.

13

defendant had possession at some time prior to the commencement of the action. *See Vicars v. Atl. Disc. Co.*, 140 S.E.2d 667, 670 (Va. 1965).

The court concludes that this claim fails because Lokey and Leatherwood are entitled to sovereign immunity, and so Shabazz cannot obtain the relief he seeks from them.[4] As already noted, any tortious conduct here was, at most, negligent. In general terms, sovereign immunity will shield state employees from liability for acts of simple, but not gross, negligence, where the acts are discretionary and not ministerial. *Colby v. Boyden*, 400 S.E.2d 184, 186–87 (Va. 1991); *see also Groves v. Cox*, 559 F. Supp. 772, 774–75 (E.D. Va. 1983) (collecting authority noting the possibility of a sovereign immunity defense to a Virginia claim for detinue or return of property).

In determining whether defendants' acts were discretionary, such that immunity extends to them, the court looks to the factors set forth in *James v. Jane*, 282 S.E.2d 864 (Va. 1980), and evaluates "(1) [t]he function the employee was performing; (2) [t]he state's interest and involvement in that function; (3) [w]hether the act performed by the employee involved the use of judgment and discretion; and (4) [t]he degree of control and direction exercised by the state over the employees." *Pike v. Hagaman*, 787 S.E.2d 89, 92 (Va. 2016).

As to the first and second *James* factors, the function that the defendants were performing was an investigation and determination of whether certain materials were gang-related or not, which involves the security of both prisoners and guards. Certainly, keeping the state's correctional facilities secure and safe is essential to a governmental objective, and the government has a great interest and involvement in that function. *See, e.g., Jennings v. Hart*,

---

[4] The fact that the defendants did not raise the sovereign immunity defense until trial is of no moment. *See Edelman v. Jordan*, 415 U.S. 651, 677–78 (1974) (noting that the defense of sovereign immunity may be raised at any time during litigation).

14

602 F. Supp. 2d 754, 759 (W.D. Va. 2009) (referencing that the state has a general interest in the safe and competent administration of its local correctional facilities). The third and fourth factors also weigh in favor of finding sovereign immunity for the acts alleged here. Defendants' acts—which included determining whether any particular document or piece of property posed a security risk as gang-related material—were not simply ministerial in nature. Defendants were trained in and familiar with gang signs and information, and they had to exercise discretion in determining whether a particular document posed a risk or not. They had to review the documents in context. Based on their testimony, there was not a list of materials that defendants simply had to follow, but they had to make individual judgments about whether a specific document, in the context of all the documents found, was gang-related and should be confiscated. Thus, the court concludes that the individual defendants were engaged in discretionary acts and are entitled to sovereign immunity for their role in seizing Shabazz's property. Shabazz is not entitled to relief on his detinue claim against Lokey or Leatherwood.

## III. CONCLUSION

For the reasons stated herein, an appropriate order entering judgment in favor of defendants Lokey and Leatherwood will be entered.

Entered: September 30, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge